**EMPIRE FIRE AND MARINE INSURANCE COMPANY,**
Plaintiff,

v.

**Robert A. JONES d/b/a R.A. Jones & Sons and James Drumheiser,**
Defendants.

and

**James H. Drumheiser, Plaintiff on the Counterclaim and Cross Claim,**

v.

**Empire Fire and Marines Insurance Company, Defendant on the Counterclaim,**

and

**Robert A. Jones d/b/a R.A. Jones & Sons, Defendants on the Cross Claim.**

No. 4:09–cv–422.

United States District Court, M.D. Pennsylvania.

Sept. 13, 2010.

Eric N. Anderson, Jason A. Rosenberger, Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C., Pittsburgh, PA, for Plaintiff.

Brigid Q. Alford, Marshall Dennehey Warner Coleman & Goggin, Harrisburg, PA, Frank E. Garrigan, Garrigan & Targonski, Shamokin, PA, Edward E. Kopko, Edward E. Kopko, Lawyer, P.C., Ithaca, NY, for Defendants.

### MEMORANDUM

JOHN E. JONES III, District Judge.

## THE BACKGROUND OF THIS MEMORANDUM IS AS FOLLOWS:

This matter is before the Court on the Report and Recommendation ("R & R") of

Magistrate Judge Thomas M. Blewitt (Doc. 54), filed on August 19, 2010, which recommends that we grant the Plaintiff's Motion for Summary Judgment (Doc. 28) and deny Defendant James Drumheiser's ("Drumheiser") cross-Motion for Summary Judgment. (Doc. 39). Drumheiser filed objections to the R & R on September 2, 2010. (Doc. 55). No other parties have filed objections to the R & R and the time for doing so has lapsed. Accordingly, this matter is ripe for disposition. For the reasons set forth below, the Court will adopt the Magistrate Judge's R & R, grant the Plaintiff's Motion for Summary Judgment, deny Drumheiser's cross Motion for Summary Judgment and close this case.

## I. PROCEDURAL BACKGROUND

Plaintiff Empire Fire and Marine Insurance Company ("Empire"), filed a Complaint for Declaratory Judgment on March 9, 2009 against Defendants Robert A. Jones, d/b/a R.A. Jones & Sons ("Jones") and Drumheiser seeking this Court's determination of Empire's obligation to provide liability coverage to Jones.[1] (Doc. 1). This action arose when Drumheiser was injured by a garbage truck owned and operated by Jones. Jones filed an Answer to Empire's Complaint on April 23, 2009. The following day, Drumheiser filed an Answer to Empire's Complaint, a cross claim against Jones,[2] and counterclaims against Empire.[3]

Following the close of discovery, Empire filed a Motion for Summary Judgment against Drumheiser and Jones. (Doc. 28).

Drumheiser filed a cross-Motion for Summary Judgment against Empire. (Doc. 38). We referred both of the Motions to Magistrate Judge Blewitt for an R & R. As noted above, on August 19, 2010, Magistrate Judge Blewitt issued the instant R & R, recommending that Empire's Motion be granted in its entirety and that Drumheiser's Motion be denied in its entirety.

## II. FACTUAL BACKGROUND

On August 19, 2008, Drumheiser was working for Jones' trash collection business. After tossing a bag of trash into the back of Jones' garbage truck, Drumheiser attempted to jump aboard the outside of the truck. As Drumheiser attempted to board the truck, he slipped and fell from the truck onto the road. The garbage truck, driven by Jones, proceeded to run over Drumheiser's lower leg causing severe injuries.

Empire was Jones' insurance provider at the time of the above incident. The policy provides "Truckers Coverage" to Jones doing business by and through R.A. Jones & Sons for accidents involving Jones' garbage truck. At issue in this case is whether Empire's insurance policy issued to Jones provides liability coverage Jones for the Drumheiser accident. The relevant portions of Empire's policy provide:

**SECTION II—LIABILITY COVERAGE**

**A. Coverage**

We will pay all sums an "Insured"[4] legally must pay as damages because

---

**1.** We have jurisdiction over this case pursuant to 28 U.S.C. § 1332 and the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*

**2.** Drumheiser's cross claim against Jones was dismissed by Court Order on October 14, 2009. (Doc. 25).

**3.** Drumheiser's counterclaims against Empire are: 1) request for declaratory relief seeking

this Court to declare that he is entitled to Empire's liability coverage benefits; 2) claim for breach of contract for Empire's refusal to supply him with liability coverage benefits; and 3) a claim that Empire acted in bad faith by denying him liability coverage in violation of 42 Pa.C.S.A. § 8371.

**4.** It is not disputed that Jones is an "Insured" pursuant to the insurance contract.

of "bodily injury" or property damage to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto."

(Doc. 28, Ex. A, p. 38).

The provisions below list "Exclusions" to the Empire policy's liability coverage. Relevant to this case is the "Employee" Exclusion to the policy's liability coverage. Specifically, the relevant Exclusions are as follows:

### B. Exclusions

This insurance does not apply to any of the following:

**4. Employee Indemnification and Employer's Liability**

"Bodily injury" to:

a. An "employee" of the "insured" arising out of and in the course of:

(1) Employment by the "insured"; or

(2) Performing the duties related to the conduct of the "insured's" business;

or

b. The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **a.** above.

This exclusion applies:

(1) Whether the "insured" may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of injury.

But this exclusion does not apply to "bodily injury" to domestic "employees" not entitled to workers' compensation benefits or to liability assumed by the "insured" under an "insured contract." For the purposes of the Coverage Form, a domestic "employee" is a person engaged in household or domestic work performed principally in connection with a residence premises.

**5. Fellow Employee**

"Bodily injury" to any fellow "employee" of the "insured" arising out of and in the course of the fellow "employee's" employment or while performing duties related to the conduct of your business.

(Doc. 28, Ex. A, p. 39).

There are several definitions in the policy that are relevant to this case. Specifically, they are as follows:

### SECTION V—DEFINITIONS

F. "Employee" includes a "leased worker." "Employee" does not include a "temporary worker."

I. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm to perform duties related to the conduct of your business. "Leased worker" does not include "temporary worker."

O. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

(Doc. 28, Ex. A, pp. 46–47).

Although the definition of "Employee" merely explains what the word includes and not what it means, as Magistrate Judge Blewitt aptly noted, the parties seem to agree that if Drumheiser does not fit the definition of "Temporary worker," he falls under the "Employee" exclusion to the policy's liability coverage. Thus, the critical issue in this case is whether Drumheiser was a "Temporary worker" *vel non* under the policy at the time of the accident.

At the relevant time, Jones had a business which provided coal and trash hauling services. About one year prior to the

incident on August 19, 2008, Jones ran into Michael and Gloria Kalman ("the Kalmans") at a local restaurant. During this encounter, Jones expressed that he was looking for someone to help him with his hauling services. It was at this time that the Kalmans recommended Drumheiser to Jones, with the understanding that Drumheiser would continue to work for the Kalmans as well.[5] A week or two following this encounter, Jones called Drumheiser to solicit his labor. Drumheiser agreed to work for Jones in addition to working for the Kalmans.

Drumheiser did not have a written employment contract with Jones or the Kalmans. Instead, a loosely understood arrangement evolved among the parties. Drumheiser testified that he would work one or two days a week for Jones and it would only be a couple of hours in the morning and never in the afternoon. The Kalmans mostly used Drumheiser's services in the late mornings and afternoons. Occasionally, on days Drumheiser would work for Jones, Drumheiser would call Mr. Kalman and inform him of his plans to work for Jones. Sometimes, Drumheiser would ask Mr. Kalman if it was "ok" for him to work for Jones. Mr. Kalman testified that there was never a time when his need for Drumheiser's help conflicted with Jones' need for Drumheiser's help. Further, it is admitted that Jones never paid the Kalmans for Drumheiser's work.

On the day of the accident, Drumheiser called Mr. Kalman and told him that he made arrangements to work for Jones in the morning and that he would work for Kalman in the afternoon. On that day, Jones picked Drumheiser up around 6:15 a.m. and they started hauling trash around 7:00 a.m. The accident occurred around 11 a.m.

The parties dispute whether the Kalmans "loaned" Drumheiser to Jones for the purpose of assisting Jones with his trash hauling service. Mr. Kalman testified:

> "Well Jonesy said to me, look, I'm strapped for a helper because I know that's the way Jonesy was sort of doing it, it just seemed like he couldn't hold a helper. And then he said to me, he was really disgusted, I said listen, I'll *loan* you Buttons (Drumheiser) but I want him back. I mean it was just a figure of speech. I mean I had no control over Buttons but I just said I'll *loan* you Buttons but I want him back but like in a kidding way and Buttons came every day."

(Doc. 32, Kalman Dep., p. 37) (emphasis added). While Kalman admitted that he was Drumheiser's primary employer, he also admitted that he had "no right or authority to prevent him (Drumheiser) from working with anyone." (Doc. 32, Kalman Dep., p. 13).

## III. STANDARDS OF REVIEW

### A. Review of Magistrate Judge's R & R

When objections are filed to the report of a magistrate judge, the district court makes a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objections are made. 28 U.S.C. § 636(b)(1); *United States v. Raddatz*, 447 U.S. 667, 674–75, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). The court may accept, reject, or modify, in whole or in part, the magistrate judge's findings or recommendations. *Id.* Although the standard of review is *de novo*, 28 U.S.C. § 636(b)(1) permits whatever reliance the district

---

5. Drumheiser helped maintain properties owned by the Kalmans by cutting grass and removing trash.

court, in the exercise of sound discretion, chooses to place on a magistrate judge's proposed findings and recommendations. *Raddatz*, 447 U.S. at 674–75, 100 S.Ct. 2406; *see also Mathews v. Weber*, 423 U.S. 261, 275, 96 S.Ct. 549, 46 L.Ed.2d 483 (1976); *Goney v. Clark*, 749 F.2d 5, 7 (3d Cir.1984).

### B. Summary Judgment

Summary judgment is appropriate if the record establishes "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant meets this burden by pointing to an absence of evidence supporting an essential element as to which the non-moving party will bear the burden of proof at trial. *Id.* at 325, 106 S.Ct. 2548. Once the moving party meets its burden, the burden then shifts to the non-moving party to show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e)(2). An issue is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a factual dispute is "material" only if it might affect the outcome of the action under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In opposing summary judgment, the non-moving party "may not rely merely on allegations of denials in its own pleadings; rather, its response must ... set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir.2000). Arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109–10 (3d Cir.1985). However, the facts and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the nonmoving party. *P.N. v. Clementon Bd. of Educ.*, 442 F.3d 848, 852 (3d Cir.2006).

Summary judgment should not be granted when there is a disagreement about the facts or the proper inferences that a factfinder could draw from them. *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir.1982). Still, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; there must be a *genuine* issue of *material* fact to preclude summary judgment." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505.

## IV. DISCUSSION

### A. Summary of the R & R

With respect to Empire's Motion for Summary Judgment, Magistrate Judge Blewitt concluded that Drumheiser was not considered a "Temporary worker" under the policy and that he was instead an "employee" of Jones as defined in Empire's policy. Thus, his accident is excluded from Empire's liability coverage owed to Jones. Accordingly, Magistrate Judge Blewitt recommends that Empire's Motion be granted and Drumheiser's cross-Motion on this point be denied.

Magistrate Judge Blewitt also recommends that Drumheiser's cross-Motion for Summary Judgment be denied with respect to his breach of contract and bad faith claims. With regard to the breach of contract claim, Magistrate Judge Blewitt

concluded that Drumheiser could not sue Empire for breach of contract because Drumheiser was not a party to the insurance contract between Jones and Empire. With respect to the bad faith claim, Magistrate Judge Blewitt found that Empire promptly addressed Drumheiser's claims for first party benefits and paid the full amount of medical benefits available to Drumheiser under the policy. Moreover, Magistrate Judge Blewitt noted that because Drumheiser is a third party claimant, not an insured, he cannot have a cause of action for bad faith. *See Allen v. General Accident Ins. Co.,* 2004 WL 323664 (Pa.Com.Pl.2004)

### B. Objections to the R & R

On September 2, 2010, Drumheiser filed objections to the R & R. Specifically, Drumheiser objects to Magistrate Judge Blewitt's recommendation that Empire's Motion for Summary Judgment be granted.

Drumheiser does not object to Magistrate Judge Blewitt's recommendation that Drumheiser's cross-Motion for Summary Judgment be denied with respect to his breach of contract and bad faith claims. Because we agree with the sound reasoning that led the Magistrate Judge to recommend denial of summary judgment on the breach of contract and bad faith claims, and because those recommendations are not objected to, we shall adopt these recommendations.

Thus, the only issue for our review is the Magistrate Judge's recommendation to grant Empire's Motion for Summary Judgment, and specifically, whether or not Drumheiser qualifies as a "Temporary worker" under the policy.

### C. De Novo Review

When making determinations about insurance policy coverage, courts must initially decide the scope of the insurance coverage and then review the allegations raised in the pleading to see if they would fall within the scope of the policy if proven. *See Britamco Underwriters, Inc. v. Grzeskiewicz,* 433 Pa.Super. 55, 59, 639 A.2d 1208 (1994) (citation omitted). Under Pennsylvania law, insurance contract interpretation is a question of law for the court to decide. *See Reliance Ins. Co. v. Moessner,* 121 F.3d 895, 900 (3d Cir.1997) (citation omitted). The goal of contract interpretation is "to ascertain the intent of the parties as manifested by the language of the written instrument." *Standard Venetian Blind Co. v. Am. Empire Ins. Co.,* 503 Pa. 300, 469 A.2d 563 (Pa.1983).

As summarized by the Third Circuit Court of Appeals:

> [I]n Pennsylvania a court construes ambiguities in an insurance policy strictly against the insurer. *See, e.g., Selko v. Home Ins. Co.,* 139 F.3d 146, 152 n. 3 (3d Cir.1998) (citing *Standard Venetian Blind Co. v. Am. Empire Ins. Co.,* 503 Pa. 300, 469 A.2d 563 (Pa.1983)). Nevertheless, in Pennsylvania, and no doubt elsewhere, "[c]lear policy language ... is to be given effect, and courts should not torture the language to create ambiguities but should read the policy provisions to avoid it." *Selko,* 139 F.3d at 152 n. 3 (internal citations and quotation marks omitted). In construing policy language, courts should consider any special usage "[w]here terms are used in a contract which are known and understood by a particular class of persons in a certain special or peculiar sense[.]" *Sunbeam Corp. v. Liberty Mutual Ins. Co.,* 566 Pa. 494, 781 A.2d 1189 (Pa. 2001).

*USX Corp. v. Liberty Mutual Insurance Co.,* 444 F.3d 192 (3d Cir.2006).

With regard to policy exclusions, a Court is required to give effect to them if the exclusion is clearly worded and con-

spicuously displayed in the policy. *Giangreco v. United States Life Insurance Co.*, 168 F.Supp.2d 417, 421 (E.D.Pa.2001). However, ambiguous policy exclusions are "always strictly construed against the insurer and in favor the insured." *Nationwide Mut. Ins. Co. v. Cosenza*, 258 F.3d 197, 206–07 (3d Cir.2001) (citing *Selko v. Home Ins. Co.*, 139 F.3d 146, 152 n. 3 (3d Cir.1998)). A policy exclusion is ambiguous if "reasonably intelligent [persons] on considering it in the context of the entire policy would honestly differ as to its meaning and if more precise language could have eliminated the ambiguity." *Coregis Ins. Co. v. Larocca*, 80 F.Supp.2d 452, 455 (E.D.Pa.1999) (internal citations omitted). The insurer bears the burden of establishing the applicability of an exclusion under an insurance policy. *Cosenza*, 258 F.3d at 206.

As noted above, the parties do not dispute that Drumheiser falls under the "Employee exclusion" of the Empire policy if his status does not fit the policy's "Temporary worker" definition. Thus, the issue for our determination is whether Drumheiser is a "Temporary worker" under the policy, or, whether the policy's "Temporary worker" definition is sufficiently ambiguous for the Court to render declaratory judgment in favor of Drumheiser pursuant to Pennsylvania contract law. If the Court finds that Drumheiser fits the "Temporary worker" definition, then the policy's liability coverage applies to Jones in the event Drumheiser sues Jones for damages. Or, if the Court finds that the "Temporary worker" definition of the policy is ambiguous, and that Drumheiser plausibly fits the ambiguous definition, then the insurance policy's liability coverage does apply to Jones in the event Drumheiser sues Jones for damages. Finally, and in the alternative, we may find that the "Temporary worker" definition is not ambiguous, Drumheiser does not fit

within it, and thus the exclusion applies and coverage exists.

Thus, our first task is to determine whether Empire's policy definition for "Temporary worker" is ambiguous. As previously noted, the policy defines "Temporary worker as" a "person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions." (Doc. 28, Ex. A, p. 47). Just as Magistrate Judge Blewitt noted, we find that there is no evidence that Drumheiser was a "substitute for a permanent employee on leave," thus the 'substitute' portion of the "Temporary worker" definition is not for our consideration. Therefore, we must determine whether an ambiguity exists as to whether Drumheiser was "furnished to [Jones] … to meet seasonal or short-term workload conditions."

In *Nautilus Ins. Co. v. Gardner*, 2005 WL 664358, 2005 U.S. Dist. LEXIS 4423 (E.D.Pa. Mar. 21, 2005), the district court Eastern District of Pennsylvania, tasked to interpret an insurance contract, was confronted with the identical policy exclusion as in the case *sub judice* containing the phrase "furnished to you." In *Nautilus*, the employer, William Gardner, who operated a Halloween haunted house during October, had liability insurance with Nautilus. A female employee of Gardner's sued him after being sexually assaulted by another of Gardner's employees. Under the policy, an employee, as in our case, was defined to include a "leased worker," but it excluded a "temporary worker." The "Temporary worker" definition in *Nautilus* is identical to the definition at issue in our case, namely "a person who is furnished to you to substitute for a permanent 'employee' on leave or to meet seasonal or short term workload conditions." The issue, like the issue here, was whether

the female employee was a "Temporary worker" under the policy.

The *Nautilus* court noted that the Pennsylvania Supreme Court had not yet spoken to the issue of whether the term "furnish" was ambiguous in Pennsylvania insurance law, but predicted that "the Pennsylvania Supreme Court would hold that the term 'furnished to you' in the instant insurance policy is not ambiguous under Pennsylvania law." *Id.* at *19. After a full review of the case law and the reasoning of the *Nautilus* court's reasoning, we agree. The district court noted that courts in both the Western District of Pennsylvania and the Pennsylvania Courts of Common Pleas had looked to Black's Law Dictionary to define the term "furnish" in insurance contracts governed by Pennsylvania law. *Id.* (citing *Gradler v. Prudential Prop. & Cas. Ins. Co.*, 464 F.Supp. 575, 578–79 (W.D.Pa.1979)) ("The word, 'furnish,' is variously defined as follows: To supply or provide; For use in the accomplishment of a particular purpose; Implying some active effort to accomplish the designated end.") citing Black's Law Dictionary (4th ed. 1968). Ultimately the *Nautilus* court concluded that:

> It is clear that to be "furnished," something or someone must be supplied, provided, or equipped to another entity or person. Thus, the phrase 'furnished to you,' when read together with the entire sentence, refers to a person supplied, provided, or equipped to the insured to substitute for a permanent employee or

to engage in seasonal or short-term work.

*Nautilus, supra* at *21. The court concluded that the female employee was not supplied to Gardner, thus she did not constitute a "Temporary worker."

Having determined that the policy exclusion at issue here is not ambiguous, we must determine whether Drumheiser fits within the definition of "Temporary worker." Drumheiser argues that the Kalmans "furnished" him to Jones for short-term employment. We, like Magistrate Judge Blewitt, do not agree with this argument. While the Kalmans were, quite clearly, Drumheiser's primary employers, the Kalmans did not supply or provide Drumheiser to Jones, inasmuch as they had no control over Drumheiser. Drumheiser could have just as easily refused Jones' offer of employment as he did accept it. Quite simply, Drumheiser was not the Kalmans' property that they could supply, provide, or *furnish* to Jones. Instead, they gave Jones a referral to Drumheiser, and Jones contacted Drumheiser himself to set up the terms of Drumheiser's employment with Jones.[6] Likewise, the Kalmans ultimately had no power to set the conditions of Drumheiser's employment with Jones, nor could they recall Drumheiser from that employment without his consent. Mr. Kalman's understandable desire to share the fruits of a person he considered to be an excellent part-time worker does not transform Drumheiser into a "Temporary worker," as set forth in the exclusion.

**6.** Within the R & R, Magistrate Judge Blewitt cited to ample deposition testimony of the Kalmans, Jones and Drumheiser that supports his recommendation as well as our conclusion that the Kalmans did not "furnish" Drumheiser to Jones. As noted herein, we may place as much reliance as we deem appropriate on the reasoning of the Magistrate Judge when analyzing any objections to the R

& R. Thus, for the sake of judicial economy, inasmuch as we would be citing the very same transcript portions as Magistrate Judge Blewitt did within the R & R, we shall not rewrite his R & R in our Memorandum and Order, but refer the reader to pages 19–21 of the R & R for the relevant deposition testimony.

Accordingly, we find that Drumheiser is not a "Temporary worker" under Empire's policy, and thus his accident is excluded from Empire's liability coverage owed to Jones.

## V. CONCLUSION

Based on all of the foregoing, we shall adopt the Magistrate Judge's R & R in its entirety and shall overrule the objections of Drumheiser. Empire's Motion for Summary Judgment shall be granted and Drumheiser's cross-Motion for Summary Judgment shall be denied. An appropriate Order shall issue.

## REPORT AND RECOMMENDATION

THOMAS M. BLEWITT, United States Magistrate Judge.

### I. Background.

*1. Procedural History*

Plaintiff, Empire Fire and Marine Insurance Company ("Empire"), filed a Complaint for Declaratory Judgment on March 9, 2009, against Defendants Robert A. Jones, d/b/a R.A. Jones & Sons ("Mr. Jones") and James Drumheiser (Mr. Drumheiser) seeking this Court's determination of Empire's obligation to provide liability coverage to Mr. Jones. (Doc. 1). The Court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332 and The Declaratory Judgment Act, 28 U.S.C.

§ 2201, *et seq.* This action arose when Mr. Drumheiser was injured by a garbage truck owned and operated by Mr. Jones. Mr. Jones filed an Answer to Empire's Complaint on April 23, 2009. The following day, Mr. Drumheiser filed an Answer to Empire's Complaint, a cross claim against Mr. Jones[1], and counterclaims against Empire. (Doc. 10).

Mr. Drumheiser has three counterclaims against Empire. (Doc. 10). First, Mr. Drumheiser asks for declaratory relief seeking this Court to declare that he is entitled to Empire's liability coverage benefits.[2] (Doc. 10, p. 9). Second, Mr. Drumheiser claims that Empire breached its insurance contract by refusing to supply him with liability coverage benefits. (Doc. 10, pp. 4–9).[3] Third, Mr. Drumheiser claims that Empire has acted in bad faith by denying him liability coverage, in violation of 42 Pa.C.S.A. § 8371.[4] (Doc. 10, p. 10).

After completing discovery, Empire filed a Motion for Summary Judgment against Mr. Drumheiser and Mr. Jones (Doc. 28, Exs. A and B) and a supporting Brief (Doc. 29) on February 1, 2010. Additionally, Empire submitted its Statement of Material Facts (Doc. 30), along with an appendix containing the deposition testimonies of Mr. Drumheiser, Mr. Jones, Michael F. Kalman ("Mr. Kalman") and Gloria J. Kal-

---

1. Mr. Drumheiser filed a cross claim against Mr. Jones seeking monetary damages for the injuries he sustained on August 19, 2008, while moving garbage into Mr. Jones' truck. (Doc. 10, pp. 10–14). As Empire states, "This was the anticipated claim which was the genesis of Empire's declaratory judgment complaint." (Doc. 28, p. 3). We also note that Mr. Drumheiser's cross claim against Mr. Jones was dismissed on October 14, 2009, pursuant to the District Court's Order. (Doc. 25).

2. As Empire points out, Mr. Drumheiser is not a party to the liability coverage agreement Empire had with Mr. Jones. (Doc. 1, Ex. A).

Instead, the issue in this case is whether Empire must indemnify Mr. Jones in the event that Mr. Drumheiser sues Mr. Jones for the injuries he (Mr. Drumheiser) sustained from Mr. Jones' garbage truck.

3. We note that Mr. Drumheiser is not a party to the insurance contract. (Doc. Ex. A). Thus, we find it difficult to determine what is meant by his breach of contract claim.

4. Additionally, we note that Mr. Drumheiser's bad faith claim was filed under simply "§ 8371." We presume, as does Empire, that Mr. Drumheiser means 42 Pa.C.S.A. § 8371.

man ("Mrs. Kalman"). (Doc. 32, Exhibits 1–4). On March 5, 2010, Mr. Drumheiser filed his opposition Brief to Empire's Motion for Summary Judgment (Doc. 39) and a Response to Empire's Statement of Material Facts (Doc. 40). He also filed a cross-Motion for Summary Judgment against Empire (Doc. 38), with a supporting Brief (Doc. 39) and a Counter Statement of Material Facts (Doc. 40). On April 5, 2010, Empire filed its opposition Brief to Mr. Drumheiser's cross-motion for Summary Judgment. (Doc. 49). Empire also filed a Reply Brief to Mr. Drumheiser's opposition to its Motion for Summary Judgment. (Doc. 49). On April 19, 2010, Mr. Drumheiser filed a Reply Brief to Empire's opposition to his cross-Motion for Summary Judgment.

We now give consideration to Empire's Motion for Summary Judgment **(Doc. 28)** and Mr. Drumheiser's cross-Motion for Summary Judgment. **(Doc. 39)**.[5]

### 2. Statement of Facts

On August 19, 2008, Mr. Drumheiser[6] was working for Mr. Jones' trash collection business. After tossing a bag of trash into the back of Jones' garbage truck, Mr. Drumheiser attempted to jump aboard the outside of the truck.[7] Mr. Jones operated the truck. As Mr. Drumheiser attempted to board the truck, he slipped and fell from the truck onto the road. The garbage truck proceeded to run over Mr. Drumheiser's lower leg causing severe injuries.

Empire was Mr. Jones' insurance provider at the time of the above incident. (Doc. 28, Ex. A). The insurance policy number is CL661546. (Doc. 28, Ex. A)

**5.** On February 18, 2010, the District Court referred the Summary Judgment Motions to he undersigned for the issuance of a Report and Recommendation. (Doc. 35).

**6.** Mr. Drumheiser states that "by reason of mental condition, Drumheiser lacks the capacity to contract and therefore could not

The policy provides "Truckers Coverage" at a $2,340 premium to Mr. Jones doing business by and through R.A. Jones & Sons. (Doc. 28, Ex. A, p. 3). More specifically, the policy provided liability coverage to Mr. Jones (doing business by and through R.A. Jones & Sons) for accidents involving Mr. Jones' garbage truck. (Doc. 28, Ex. A). At issue in this case is whether Empire's insurance policy issued to Mr. Jones provides liability coverage to Mr. Drumheiser. The relevant portions of Empire's policy provide:

### SECTION II—LIABILITY COVERAGE

#### A. Coverage

We will pay all sums an "Insured"[8] legally must pay as damages because of "bodily injury" or property damage to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto."

(Doc. 28, Ex. A, p. 38).

The provisions below list "Exclusions" to the Empire policy's liability coverage. Relevant to this case is the "Employee" Exclusion to the policy's liability coverage. Specifically, the relevant Exclusions are as follows:

#### B. Exclusions

This insurance does not apply to any of the following:

#### 4. Employee Indemnification And Employer's Liability

"Bodily injury" to:

a. An "employee" of the "insured" arising out of and in the course of:

enter a valid employment contract." (Doc. 10, p. 4).

**7.** This was customary practice.

**8.** Mr. Jones is an "Insured" pursuant to the insurance contract. (Doc. 28, Ex. A).

(1) Employment by the "insured"; or

(2) Performing the duties related to the conduct of the "insured's" business; or

**b.** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **a.** above.

This exclusion applies:

(1) Whether the "insured" may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of injury.

But this exclusion does not apply to "bodily injury" to domestic "employees" not entitled to workers' compensation benefits or to liability assumed by the "insured" under an "insured contract". For the purposes of the Coverage Form, a domestic "employee" is a person engaged in household or domestic work performed principally in connection with a residence premises.

**5. Fellow Employee**

"Bodily injury" to any fellow "employee" of the "insured" arising out of and in the course of the fellow "employee's" employment or while performing duties related to the conduct of your business.

(Doc. 28, Ex. A, p. 39).

The following policy provision contains "Definitions." Relevant to this case are the definitions of "Employee," "Leased worker," and "Temporary worker." Specifically, the pertinent definitions are:

**SECTION V—DEFINITIONS**

F. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker."

I. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

O. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

(Doc. 28, Ex. A, pp. 46–47).

Although the definition of "Employee" merely explains what the word includes and not what it means, the parties seem to agree that if Mr. Drumheiser does not fit the definition of "Temporary worker," he falls under the "Employee" exclusion to the policy's liability coverage.[9]

---

9. We note that no written contract existed between Mr. Jones and Mr. Drumheiser. (Doc. 32, Drumheiser Depo., NT 81–82). We further note that neither Mr. Jones nor Mr. Drumheiser kept records of the hours which Mr. Drumheiser worked for Mr. Jones. (*Id.*). Federal law requires an employer to deduct income taxes from an employee's wages unless the employee files an exemption certificate. *See* 26 U.S.C.A. § 3402. There is no indication that Mr. Jones deducted income taxes from Mr. Drumheiser's wages nor is there any indication that Mr. Drumheiser filed an exemption certificate. Further, Mr. Jones did not pay Mr. Drumheiser according to an hourly rate. (Doc. 32, Jones Depo. p. 33). Rather, Mr. Jones paid Mr. Drumheiser depending on the work Mr. Drumheiser performed on a given day. (*Id.*). Nevertheless, the parties do not dispute that Mr. Drumheiser was an "Employee" if he fails to fit the "Temporary worker" definition. The Court should comport with the parties' intentions. *See Pacific Indem. Co. v. Linn*, 766 F.2d 754, 761 (3d Cir.1985) (*citing Celley v. Mutual Benefit Health & Accident Association*, 229 Pa.Super. 475, 324 A.2d 430, 434 (Pa.1974).

Thus, the issue in this case is whether Mr. Drumheiser was a "Temporary worker" under the policy at the time of the accident.[10]

At the relevant time, Mr. Jones had a business which provided coal and trash hauling services. (Doc. 32, Jones Dep. p. 14). About one year prior to the incident on August 19, 2008, Mr. Jones ran into Michael and Gloria Kalman ("the Kalmans") at a local restaurant. (*Id.*, Jones Dep., p. 21). During this encounter, Mr. Jones expressed that he was looking for someone to help him with his hauling services. (*Id.*, Jones Dep., p. 21). It was at this time that Mr. Kalman recommended Drumheiser[11] to Mr. Jones with the understanding that Drumheiser would continue to work for the Kalmans as well. (*Id.*, Jones Dep., p. 21). The Kalmans owned real estate which they rented out and sold. They informed Mr. Jones that Mr. Drumheiser helped them maintain their properties by removing trash and cutting grass. (*Id.*, M. Kalman Dep., p. 16). Mr. Jones called Mr. Drumheiser a week or two following his encounter with the Kalmans to solicit Drumheiser's labor.[12] (Doc. 32, Jones Dep., p. 26). Mr. Drumheiser agreed to work for Mr. Jones

in addition to continuing to work for the Kalmans. (Doc. 32, Mr. Jones Dep., p. 27).

Mr. Drumheiser did not have an employment contract with the Kalmans (Doc. 40, p. 20), nor did he have an employment contract with Mr. Jones (Doc. 32, Drumheiser Depo. 81–82). However, both Mr. Jones and the Kalmans wanted to use Drumheiser's labor services. (Doc. 32, Mr. Kalman Dep., p. 13).[13] A loosely understood arrangement evolved between the three parties, Mr. Jones, Mr. Kalman, and Mr. Drumheiser. As both Empire and Drumheiser agree (Doc. 40), "Mr. Drumheiser testified that he would work one or two days a week for Mr. Jones and it would only be a couple of hours and never in the afternoon." (Doc. 30, ¶ 21, and Doc. 32, Drumheiser Dep., p. 27–28). Drumheiser would work for Mr. Jones' hauling service in the morning on the days when Mr. Jones' required additional assistance.[14] (Doc. 32, Jones Dep., pp. 18–20). The Kalmans mostly used Mr. Drumheiser in the late mornings and afternoons. (Doc. 32, Jones Dep., p. 69). As such, even on the days when Drumheiser worked for Mr. Jones he was still available to work for the Kalmans.[15] Occasionally, on days Mr. Drumheiser would work for Mr. Jones, Drumheiser would call Kalman and inform

10. The parties agree that Mr. Drumheiser did not constitute a "Leased Worker" because he was not leased to Mr. Jones through a labor leasing firm. (Docs. 29 and 39).

11. The Kalman's affectionately referred to Mr. Drumheiser as "Buttons." (Doc. 32, Mr. Kalman Dep. p. 15).

12. A disputed fact in this case is whether "Mr. Drumheiser had also been calling Mr. Jones on the phone prior to Mr. Jones meeting the Kalmans about Mr. Drumheiser working for Mr. Jones." (Doc. 40, p. 12–13).

13. Mr. Drumheiser also did manual labor for other people in addition to Mr. Kalman and Mr. Jones. (Doc. 32, Drumheiser Dep., pp. 62–63).

14. Occasionally, Mr. Drumheiser would accompany Mr. Jones inside the garbage truck even on days when Mr. Drumheiser's labor was not needed. Mr. Drumheiser simply enjoyed riding in Mr. Jones' truck. (Doc. 32, Jones Dep., p. 35).

15. Mr. Drumheiser's attorney defined this relationship as follows: "Most of the time there would be no problem between Kalman, Drumheiser, and Jones because each agreed to the arrangement and understood that Drumheiser worked primarily for Kalman and that Drumheiser would be loaned to Jones as Kalman's needs permitted and as Jones needs suggested." Mr. Drumheiser's attorney argues that Mr. Drumheiser only worked for Mr. Jones when Mr. Kalman permitted. (Doc. 40, p. 18).

him of his (Drumheiser's) plans to work for Jones. (Doc. 32, Kalman Dep., p. 17). Drumheiser would sometimes ask Kalman if it is was "ok" for him to work for Jones. (Doc. 32, Kalman Dep., p. 21).[16] Mr. Kalman states that there was never a time when his need for Drumheiser's help conflicted with Mr. Jones' need for Drumheiser's help.[17] (Doc. 32, Kalman Dep., pp. 16–17). Furthermore, it is admitted that Mr. Jones never paid Mr. Kalman for Drumheiser's work for him (Jones). (Doc. 40, p. 23).

On the day of accident, Mr. Drumheiser called Mr. Kalman and told him that he made arrangements to work for Mr. Jones in the morning and that he would work for Mr. Kalman in the afternoon. (Doc. 32, Mr. Kalman Dep., p. 26). On that day, Mr. Jones picked up Mr. Drumheiser at Drumheiser's home at around 6:15 AM. (Doc. 32, Drumheiser Dep., p. 114). The two began hauling trash at 7 AM, and the accident occurred at around 11 AM. (Doc. 32, Drumheiser Dep., pp. 115–16).

The parties dispute whether Mr. Kalman "loaned" Mr. Drumheiser to Mr. Jones for the purpose of assisting Mr. Jones with his trash hauling service for the days Drumheiser worked for Jones. In Mr. Kalman's deposition, he stated:

"Well, Jonesy (Mr. Jones) said to me, look, I'm strapped for a helper because I know that's the way Jonesy was sort of doing it, it just seemed like he couldn't hold a helper. And then he said to me, he was really disgusted, I said listen, I'll *loan* you Buttons but I want him back. I mean it was just a figure of speech. I mean I had no control over Buttons but I just said I'll *loan* you Buttons but I want him back but like in a kidding way and Buttons came every day."

(Doc. 32, Kalman Dep., p. 37) (emphasis added).

While Mr. Kalman admitted that he was Mr. Drumheiser's primary employer (Doc. 32, Mr. Kalman Dep., p. 13), he also admitted that he had no "right or authority to prevent him (Drumheiser) from working with anyone." (Doc. 32, Mr. Kalman Dep., p. 13).

We consider the above facts in discussing whether the Court should grant Empire's Motion for Summary Judgment or whether the Court should grant Mr. Drumheiser's cross-Motion for Summary Judgment.

## II. Summary Judgment Standard.

Summary judgment is appropriate when: (1) there are no material facts in dispute; and (2) one party is entitled to judgment as a matter of law. *See Int'l Union, United Mine Workers of Am. v. Racho Trucking Co.*, 897 F.2d 1248, 1252 (3d Cir.1990) (citing Fed. R. Civ. Pro. 56(c)). A district court may properly grant a motion for summary judgment when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Material facts" are

---

16. *Mr. Drumheiser would not call Mr. Kalman every time he went to work for Mr. Jones or anyone else. However, he did call Mr. Kalman the day of the accident informing him that he (Mr. Drumheiser) would be working for Mr. Jones in morning, and that he would work for Kalman in the afternoon. (Doc. 32, Kalman Dep., p. 26)*

17. Mr. Drumheiser's attorney neither denies nor admits this statement responding, "[Mr.] Drumheiser lacks personal knowledge of this alleged fact and therefore does not deny nor admit this alleged fact." (Doc. 40, p. 27). Regardless, the statement is supported by Mr. Kalman's deposition testimony. (Doc. 32, Mr. Kalman Dep., pp. 16–17).

those which might affect the outcome of the suit. *Id.; Justofin v. Metropolitan Life Ins. Co.,* 372 F.3d 517, 521 (3d Cir. 2004).

Regardless of who bears the burden of persuasion at trial, the party moving for summary judgment has the burden to show an absence of genuine issues of material fact. *Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1080 (3d Cir.1996) (citations omitted). To meet this burden when the moving party does not bear the burden of persuasion at trial, the moving party must show "'that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the nonmovant's burden of proof at trial.'" *Jalil v. Avdel Corp.,* 873 F.2d 701, 706 (3d Cir.1989) (quoting *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 896 (3d Cir. 1987)); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Thus, a party moving for summary judgment who does not bear the burden of persuasion at trial is not required to negate the nonmovant's claim, but only point out a lack of evidence sufficient to support the nonmovant's claim. *Country Floors, Inc. v. Partnership Composed of Gepner and Ford,* 930 F.2d 1056, 1061 (3d Cir.1991).

Once the moving party meets its burden of showing an absence of genuine issues of material fact, the nonmoving party must provide some evidence that an issue of material fact remains. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmoving party, however, cannot do so by merely offering general denials, vague allegations, or conclusory statements; rather, the party must point to specific evidence in the record that creates a genuine issue as to a material fact. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548; *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.,* 172 F.3d 238, 252 (3d Cir.1999).

## III. Discussion.

### 1. Declaratory Judgment

As stated, this action was filed by Empire against Jones and Drumheiser under the federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.,* in order to decide a question in actual controversy between the parties, namely whether Empire's policy provides liability coverage to Drumheiser. The Declaratory Judgment Act provides this Court with the discretionary authority to grant declaratory relief. *See State Auto Ins. Co. v. Summy,* 234 F.3d 131, 133 (3d Cir.2000). As Empire states (Doc. 29, p. 9), this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

 In making an insurance policy coverage determination, the court must initially decide the scope of the insurance coverage and then review the allegations raised in the pleading to see if they would fall within the scope of the policy if proven. *See Britamco Underwriters, Inc. v. Grzeskiewicz,* 433 Pa.Super. 55, 59, 639 A.2d 1208 (1994) (citation omitted). Further, under Pennsylvania law, the interpretation of an insurance contract is a question of law for the court to decide. *See Reliance Ins. Co. v. Moessner,* 121 F.3d 895, 900 (3d Cir.1997) (citation omitted).[18]

The Court in *USX Corp.* stated:

---

**18.** Pennsylvania substantive law is utilized in this diversity case as this Court sits in Pennsylvania. *See Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Gasperini v. Center for Humanities, Inc.,* 518 U.S. 415, 427, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996). Thus, we apply Pennsylvania law with respect to the insurance coverage issue as the events in question all occurred in Pennsylvania, the policy was issued in Pennsylvania, the policy contained Pennsylvania Changes, Notices and Exclusions, and it was delivered in Pennsylvania to Jones. (Doc. 28, Ex. A). We also note that the par-

"[I]n Pennsylvania a court construes ambiguities in an insurance policy strictly against the insurer. *See, e.g., Selko v. Home Ins. Co.*, 139 F.3d 146, 152 n. 3 (3d Cir.1998) (*citing Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 503 Pa. 300, 469 A.2d 563, 566 (Pa.1983)). Nevertheless, in Pennsylvania, and no doubt elsewhere, "[c]lear policy language ... is to be given effect, and courts should not torture the language to create ambiguities but should read the policy provisions to avoid it." *Selko,* 139 F.3d at 152 n. 3 (internal citations and quotation marks omitted). In construing policy language, courts should consider any special usage "[w]here terms are used in a contract which are known and understood by a particular class of persons in a certain special or peculiar sense[.]" *Sunbeam Corp. v. Liberty Mut. Ins. Co.*, 566 Pa. 494, 781 A.2d 1189, 1193 (Pa.2001)."

*USX Corp. v. Liberty Mut. Ins. Co.*, 444 F.3d 192, 198 (3d Cir.2006).

In *Hollingsworth v. State Farm Fire & Cas. Co.*, 2005 WL 563414 (E.D.Pa.), the Court stated as follows:

Under Pennsylvania law, interpretation of a policy exclusion is a question of law for the court. *Allstate Ins. Co. v. Davis,* 977 F.Supp. 705, 711 (E.D.Pa.1997), and "the goal ... is to ascertain the intent of the parties as manifested by the language of the written instrument." *Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 503 Pa. 300, 469 A.2d 563, 566 (Pa.1983). A court is required to give effect to a policy exclusion if the exclusion is clearly worded and conspicuously displayed in the policy. *Giangreco v. United States Life Ins. Co.*, 168 F.Supp.2d 417, 421 (E.D.Pa.2001). However, ambiguous policy exclusions are "always strictly construed against the insurer and in favor of the insured."

*Nationwide Mut. Ins. Co. v. Cosenza,* 258 F.3d 197, 206–07 (3d Cir.2001) (citing *Selko v. Home Ins. Co.*, 139 F.3d 146, 152 n. 3 (3d Cir.1998)). A policy exclusion is ambiguous if "reasonably intelligent [persons] on considering it in the context of the entire policy would honestly differ as to its meaning, and if more precise language could have eliminated the ambiguity." *Corgis Ins. Co. v. Larocca,* 80 F.Supp.2d 452, 455 (E.D.Pa. 1999) (internal citations omitted). The insurer bears the burden of establishing the applicability of an exclusion under an insurance policy. *Cosenza,* 258 F.3d at 206.

2005 WL 563414, *5 (footnote omitted).

The initial burden of establishing coverage under an insurance policy rests with the insured. *Id.* at n. 1 (citation omitted).

As discussed above, the parties do not dispute that Mr. Drumheiser falls under the "Employee exclusion" of the Empire policy if his status does not fit the policy's "Temporary worker" definition. Thus, the issue here is whether Mr. Drumheiser constitutes a "Temporary worker" under the policy, or at least, whether the policy's "Temporary worker" definition is sufficiently ambiguous for the Court to render declaratory judgment in favor of Mr. Drumheiser pursuant to Pennsylvania contract law. *See Coppola v. Insurance Placement Facility of Pennsylvania,* 386 Pa.Super. 413, 563 A.2d 134, 136 (Pa.Super.1989) ("While any ambiguities in an insurance contract will be resolved in favor of the insured, a court is required to give effect to clear unambiguous language"). If the Court finds that Drumheiser fits the "Temporary worker" definition, then the insurance policy's liability coverage applies to Mr. Jones in the event that Mr. Drumheiser sues Jones for damages. If the Court finds that the "Temporary worker"

ties also apply Pennsylvania law in their

Briefs. (Doc. 29 and 36).

definition of the policy is unambiguous, and that Mr. Drumheiser does not fit the definition, then the insurance policy's liability coverage does not apply to Mr. Jones in the event that Drumheiser sues Jones for damages.

We begin our analysis by looking at the definition of "Temporary worker" under Empire's insurance policy. The policy states:

**O.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

(Doc. 28, Ex. A, p. 47).

 An insurance company bears the burden of proving the applicability of an exclusion to its coverage. *See Erie Exchange v. Muff,* 851 A.2d 919 (Pa.Super.2004) ("An insurer who disclaims its duty to defend based on a policy exclusion bears the burden of proving the applicability of the exclusion.") *quoting Board of Public Education of School District of Pittsburgh v. National Union Fire Ins. Co. of Pittsburgh,* 709 A.2d 910, 913 (Pa.Super.1998) *appeal denied,* 556 Pa. 669, 727 A.2d 126 (Pa.1998) (internal citations omitted). In an insurance contract, an exclusion provision's applicability depends on whether the provision's language is ambiguous. *See Coppola v. Insurance Placement Facility of Pa.,* 386 Pa.Super. 413, 563 A.2d 134, 136 (Pa.Super.1989). Where language is ambiguous, such provisions are to be interpreted in the insured's favor. *Id.* However, where an exclusion's language is clear and unambiguous, courts are required to give effect to such provisions "irrespective of whether the insured read the limitations or understood their import." *Pacific Indem. Co. v. Linn,* 766 F.2d 754, 760 (3d Cir.1985) *citing Standard Venetian Blind Co. v. Am. Empire Ins. Co.,* 503 Pa. 300, 469 A.2d 563, 567 (1983).

Whether an insurance contract's provision is ambiguous is a question of law. *See Aetna Cas. and Sur. Co. v. Roe,* 437 Pa.Super. 414, 650 A.2d 94, 98 (1994). As such, it may be resolved in a declaratory judgment action. *Id.* The Court in *Neuhard v. Traveler's Ins. Co.,* 831 A.2d 602, 605 (Pa.Super.2003), outlined considerations courts should employ in determining whether an insurance contract's provision is ambiguous. *See Neuhard,* 831 A.2d at 602. The *Neuhard* Court stated:

Contractual language is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. This is not a question to be resolved in a vacuum. Rather, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts. We will not, however, distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity. The polestar of our inquiry, therefore, is the language of the insurance policy.

Additionally, an ambiguity does not exist simply because the parties disagree on the proper construction to be given a particular policy provision. *Tyler v. Motorists Mutual Ins. Co.,* 779 A.2d 528, 531 (Pa.Super.2001). "Courts should read policy provisions to avoid ambiguity if possible." *Id.*

*Neuhard,* 831 A.2d at 602.

 Lastly, "[e]ven if a term is not defined in an insurance policy, a term is not ambiguous where it possesses a clear legal or common meaning that may be supplied by the court." *Nautilus Insurance Co. v. Gardner,* 2005 WL 664358 (E.D.Pa.) *citing City of Erie v. Guar. Nat'l Co.,* 109 F.3d 156, 163 (3d Cir.1997).

Applying the above rules, we must consider whether the "Temporary worker"

definition under Empire's policy is sufficiently ambiguous to construe the provision in Mr. Drumheiser's favor. *See Coppola* 563 A.2d at 136. More specifically, we must determine if it is ambiguous whether Mr. Drumheiser was *"furnished* to [Mr. Jones] to substitute for a permanent employee on leave or to meet seasonal or short-term workload conditions." (Doc. 28, Ex. A, p. 47).

█ In this case, there is no evidence that Mr. Drumheiser was a "substitute for a permanent 'employee' on leave." Therefore, we find no ambiguity as to whether Mr. Drumheiser fits the "substitute" portion of the exclusion provision. Accordingly, we must determine if an ambiguity exists as to whether Mr. Drumheiser was "furnished [to Mr. Jones] to meet seasonal or short-term workload conditions." While we find it arguable that Mr. Drumheiser worked only to satisfy "short-term workload conditions," as he served Mr. Jones only on days when workload conditions were heavy, we cannot conclude that ambiguity exists as to whether Mr. Kalman "furnished" Drumheiser to Mr. Jones. As such, we will recommend that Empire's Motion for Summary Judgment be granted and that Mr. Drumheiser's cross-Motion for Summary Judgment be denied.

█ Though the Pennsylvania state courts have yet to speak on whether "furnish" in the present context is an ambiguous term, we agree with the District Court in *Nautilus Ins. Co. v. Gardner*, 2005 WL 664358 (E.D.Pa.), and predict that the Pennsylvania Supreme Court would hold that "furnish" is not an ambiguous term as it pertains to the "Temporary worker" definition in Empire's policy. *See Nautilus Ins. Co.*, 2005 WL 664358 (E.D.Pa.) ("[We] predict that the Pennsylvania Supreme

Court would hold that the term 'furnished to you' in the instant insurance policy is not ambiguous under Pennsylvania law."). The District Court in *Nautilus Ins. Co.*, had to interpret a liability coverage policy similar to the one presented in this case. In *Nautilus*, the employer, William Gardner who operated a Halloween spook house during October, had liability insurance. As in our case, "Bodily injury" to an "employee" was excluded from coverage. A female employee of Gardner's sued Gardner and sought to indemnify Nautilus after being sexually assaulted by another one of Gardner's employees. Under Gardner's policy, which the Nautilus Insurance Company provided, an employee, as in our case, was defined to include a "leased worker" [19] but it excluded a "temporary worker." The "Temporary worker" definition at issue in *Nautilus* is the same definition at issue in our case, namely, "a person who is furnished to you to substitute for a permanent 'employee' on leave or to meet seasonal or short term workload conditions." The issue in *Nautilus*, like the issue here, was whether the female employee constituted a "Temporary worker" under the Nautilus policy. More specifically, the Court was asked whether the term "furnished to you" was ambiguous to construe in favor of the insured, Gardner. In holding that the term "furnished to you" was not ambiguous, the Court stated:

> It is clear that to be "furnished," something or someone must be supplied, provided, or equipped to another entity or person. Thus, the phrase 'furnished to you,' when read together with the entire sentence, refers to a person supplied, provided, or equipped to the insured to substitute for a permanent employee or

---

**19.** A "leased worker" under the Nautilus policy was defined as "a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm to perform duties related to the conduct of your business." This definition of "leased worker" is the same as the Empire policy's definition of "leased worker."

to engage in seasonal or short term work.

Because the female employee in *Nautilus* was not supplied to Gardner, the Court found that she did not constitute a "Temporary worker."

Furthermore, Black's Law Dictionary defines "furnish" as "to supply, provide, or equip, for accomplishment of a particular purpose." In *Gradler v. Prudential Prop. & Cas. Ins. Co.*, 464 F.Supp. 575, the District Court in Western District of Pennsylvania applied the Black's Law Dictionary definition of "furnish" when it held that a vehicle was furnished to plaintiff for purposes of liability coverage. *See Gradler*, 464 F.Supp. at 578–79. Thus, based on the above discussion, we find that "to furnish" requires that someone or something be supplied or provided to accomplish a specific purpose.

Applying the above discussed rationale to Drumheiser's status, we find that Drumheiser was not "furnished" to Mr. Jones. We also find that there exists no ambiguity on the question of whether Drumheiser was "furnished" to Mr. Jones by Mr. Kalman. While Mr. Kalman admits that he was Drumheiser's "primary employer," and that he recommended Drumheiser to work for Mr. Jones, it does not follow that Mr. Kalman *supplied* or *provided* Drumheiser to Mr. Jones.

Mr. Drumheiser's counsel asserts that Mr. Kalman "furnished" Drumheiser to Mr. Jones because Drumheiser would, from time to time, call and inform Mr. Kalman on the days that he would work for Jones. (*See* Doc. 32, Ex. 3, Mr. Kalman Dep., p. 21). Mr. Drumheiser's counsel contends that because Drumheiser would call Mr. Kalman, it follows that Drumheiser had to ask Kalman for permission before working for Mr. Jones. Thus, Mr. Drumheiser's counsel argues that Mr. Kalman had the discretion to decide when and for whom Mr. Drumheiser worked.

Therefore, Drumheiser's counsel asserts that Mr. Kalman *supplied* or *furnished* Mr. Drumheiser to Mr. Jones.

We disagree with the reasoning of Mr. Drumheiser's counsel. We find that, according to the evidence, Mr. Kalman felt he had first priority to Drumheiser's services because Drumheiser had been working for Kalman prior to working for Mr. Jones. As Mr. Kalman's deposition indicates, he (Mr. Kalman) was "primarily concerned about [Drumheiser] not being available to help [him, Mr. Kalman] and that's why [Mr. Kalman] was concerned about [Drumheiser] working for other people." (Doc. 32, Ex. 3, Mr. Kalman Dep., p. 25). We find that the other people for whom Drumheiser also worked understood and acknowledged Mr. Kalman's feeling that he had first priority to Drumheiser's services, which is why Mr. Jones would only use Drumheiser a few times per week and only in the mornings so as not to conflict with Kalman's schedule. Based on his own admission, Mr. Kalman had no authority and control with respect to when and for whom Mr. Drumheiser worked. Specifically, Mr. Kalman testified as follows:

Q. Mr. Kalman, did you ___ you mentioned you had no written contract with Mr. Drumheiser; is that correct?

A. No, I never had a written contract.

Q. Okay. So he could have worked for anybody he wanted to; right?

A. Yes.

Q. You didn't have any right or authority to prevent him from working with anyone; did you?

A. No, I didn't have any right or authority but he ___ I think it was an honesty basis because I did give him the majority of the work, so as a result I said to him, you know, I just want you to stay with me, yeah.

Q. Yeah. You feel he had some allegiance to you?

A. I felt that loyalty, yeah.

Q. But certainly no ___ you had no right to withhold work from him?

A. No, I had no right, no.

Q. And if he wanted to work for Mr. Jones he could do so and he did often; right?

A. Yes.

Q. And when he wanted to work for some of the other people that you mentioned, you said that he worked with a number of people, he could do that?

A. Well, I said that wrong, he worked for a few people and it was just ___ he was faithful to them as far as grass cutting was concerned, that's as much as I know about that, and he could do that without ___.

Q. Without interfering with your work?

A. Right.

Q. You were primarily concerned about him not being available to help you and that's why you were concerned about him working for other people?

A. Yes.

Q. Okay. Did you talk to other people ___ did you make arrangements with other people for Mr. Drumheiser to work for them or is that something Mr. Drumheiser worked out himself with other people?

A. No, that's just something he did on his own.

Q. Okay. So he would occasionally call you and say I'm going to work for so and so, is that okay?

A. No, he never called me and told me. I just knew that he did that. He would mention that to me in conversation. I didn't job him out to those other people, he did that on his own.

Q. Well, you said that he would call you, did I misunderstand you, he would call you and say he was going to work for somebody today ___ that Mr. Drumheiser would call you and say I'm going

to work for Mr. Jones today, is that okay? Is that what he would do?

A. No, he called me that ___ the day that he was injured, after this conversation with Jones and said he's going to be working for Jones that day because we had brush scheduled.

Q. Yes.

A. He wouldn't call me every day, but he called me that day and told me that. And I did make it clear to Jones that, you know, you can use him but when I need him I need him, you know, and I didn't have anything in writing to that effect, no.

Q. Okay. So Mr. Drumheiser called you the day of the accident and told you he was going to work for Mr. Jones and you said that was okay?

A. Yes.

Q. But on days before that day he wouldn't necessarily call you and tell you he was going to be working for somebody else; did he?

A. No.

Q. He would just go to work for whomever and then whenever ___ would he call you and tell you he was available or ___?

A. No, he would just show up ___ he would just show up for work. He showed up for work even every day when he was working with Mr. Jones.

Q. Okay. How about the other people, did he show for work when he would work for other people?

(Doc. 32, Ex. 3, Mr. Kalman Depo., pp. 23–27).

Thus, we find that Mr. Kalman did not *supply* or *furnish* Drumheiser to Mr. Jones. Mr. Kalman merely recommended Drumheiser to Jones with the understanding that Drumheiser would, in good faith, continue to do work for Kalman, and that Jones would not interfere with this relationship. Again, this is precisely why Drumheiser would only work for Jones a

couple of hours in the morning, one or two days per week. (Doc. 32, Ex. 1, Drumheiser Dep., pp. 27–28).

Accordingly, we find no ambiguity concerning the question of whether Mr. Drumheiser fits the "Temporary worker" definition under Empire's policy. We find that Drumheiser clearly was not a "temporary worker" under the policy. Thus, we find that Mr. Drumheiser was an "employee" of Mr. Jones as defined in Empire's policy, and that his accident is excluded from Empire's liability coverage owed to Mr. Jones. We will recommend that Empire's Motion for Summary Judgment (Doc. 28) be granted and that Mr. Drumheiser's cross-Motion for Summary Judgment (Doc. 38) be denied.

### 2. Breach of Contract

Mr. Drumheiser also claims that Empire is in breach of contract for its failure to provide liability coverage to him following the August 19, 2008 accident. (Doc. 10, p. 9). Under Pennsylvania law, a breach of contract action requires: 1) the existence of a contract; 2) a breach of a duty imposed by the contract; and 3) damages. *See Sullivan v. Chartwell Inv. Partners, LP*, 873 A.2d, 710, 716 (Pa.Super.2005) *citing J.F. Walker Co. v. Excalibur Oil Group, Inc.*, 792 A.2d 1269 (Pa.Super.2002). As discussed above, Mr. Drumheiser is not a party to the insurance contract between Mr. Jones and Empire. Because Mr. Drumheiser is not a party to the contract, there is no contract between Drumheiser and Empire. As such, Drumheiser may not sue Empire for breach of contract because the first stated element, *i.e.*, the "existence of a contract," is not satisfied. *See Sullivan*, 873 A.2d at 716.

Drumheiser argues that he is entitled to "liability coverage benefits" under Empire's contract with Mr. Jones. He asserts that he is an "insured" pursuant to the Empire insurance policy. We find hat Mr. Drumheiser confuses what it means to be an "insured" with "liability coverage benefits." We find that the policy provides that Drumheiser would be an "insured" if he were sued for injuring a person or property while he was working for Mr. Jones. We do not find that the policy provides that Drumheiser is entitled to recover from Empire in the event he is injured while working for Mr. Jones. In order for Mr. Drumheiser to establish that he is entitled to coverage under the Empire policy, he must first succeed with respect to third party tort liability against Mr. Jones. Mr. Drumheiser has not yet succeeded with such tort liability against Mr. Jones. Thus, we find that Mr. Drumheiser has no contract claim against Empire.

Accordingly, we will recommend that Empire's Motion for Summary Judgment with respect to Mr. Drumheiser's breach of contract claim be granted.

### 3. Bad Faith Claim

Mr. Drumheiser asserts a Pennsylvania bad faith claim against Empire under 42 Pa.C.S.A. § 8371. First, Mr. Drumheiser contends that Empire is liable for bad faith under § 8371 for its refusal to pay first party benefits to him. Second, Mr. Drumheiser contends that Empire violated the § 8371 bad faith provision when it denied him "liability coverage benefits" without adequately investigating whether he was a "Temporary worker" under the Empire policy.

In the case of *Krisa v. Equitable Life*, 113 F.Supp.2d 694, 702–703 (M.D.Pa.2000), the Court discussed a bad faith claim under Pennsylvania law.[20] The *Krisa* Court stated as follows:

**20.** As noted above, since this is a diversity case, we shall apply Pennsylvania law. *See*

The standard for assessing insurer bad faith under § 8371 was recently restated in *Keefe v. Prudential Property and Casualty Ins. Co.*, 203 F.3d 218, 225 (3d Cir.2000): [T]he term bad faith includes 'any frivolous or unfounded refusal to pay proceeds of a policy.' 'For purposes of an action against an insurer for failure to pay a claim, such conduct imparts a dishonest purpose and means a breach of a known duty (i.e., good faith and fair dealing), through some motive of self interest or ill will; mere negligence or bad judgment is not bad faith.' Therefore, in order to recover under a bad faith claim, a plaintiff must show (1) that the defendant did not have a reasonable basis for denying benefits under the policy; and (2) that the defendant knew or recklessly disregarded its lack of reasonable basis in denying the claim. These two elements—absence of a reasonable basis for denying a claim under the policy and knowledge or reckless disregard of the lack of such reasonable basis— must be proven by clear and convincing evidence. *Klinger v. State Farm Mut. Auto. Ins. Co.*, 115 F.3d 230, 233 (3d Cir.1997). Because "the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case," *Anderson*, 477 U.S. at 254–55, 106 S.Ct. 2505, 91 L.Ed.2d 202, a proponent of a bad faith claim "must present sufficient evidence such that, if believed, a jury could find bad faith under the clear and convincing standard." *Greco v. The Paul Revere Life Ins. Co.*, No. Civ.A. 97–6317, 1999 WL 95717, *3 (E.D.Pa., Feb. 12, 1999).

*Id.*

 In Pennsylvania, the good faith standard requires the insurance company to evaluate the case in an "honest, intelli-

gent and objective" manner. *U.S. Fire Ins. Co. v. Royal Ins. Co.*, 759 F.2d 306, 311 (3d Cir.1985) (citation omitted). In *Krisa*, 113 F.Supp.2d at 704, the Court noted that "the case law uniformly assesses bad faith in the context of the terms of the insurance policies and the nature of the investigation undertaken by the insurance company. Thus, even where a court has concluded that an insurance company was obligated under its contract to pay benefits, summary judgment has been entered in favor of the insured on a bad faith claim. *See, e.g., Kearns v. Minnesota Mutual Life Ins. Co.*, 75 F.Supp.2d 413, 421 (E.D.Pa.1999); *Lieberson v. Chubb Life Ins. Co.*, No. Civ.A. 97–5716, 1998 WL 404537, *2 (E.D.Pa., July 14, 1998)."

The *Krisa* Court quoted *Cantor v. Equitable Life Assurance Soc'y*, 1999 WL 219786, *3 (E.D.Pa.1999), which stated that "for an insurance company to show that it had a reasonable basis, *an insurance company is not required to demonstrate its investigation yielded the correct conclusion or even that its conclusion more likely than not was accurate. The insurance company also is not required to show the process by which it reached its conclusion was flawless or that the investigatory methods it employed eliminated possibilities at odds with its conclusion. Rather an insurance company simply must show it conducted a review or investigation sufficiently thorough to yield a reasonable foundation for its action.*" *Id.* (Emphasis added).

In *NIA Learning Center, Inc. v. Empire Fire and Marine Ins. Companies*, 2009 WL 3245424, *11 (E.D.Pa.), the Court stated:

> Federal courts in Pennsylvania generally recognize that a contractual bad faith claim and a statutory bad faith claim are entirely separate causes of action. See

*The Northwestern Mutual Life Ins. Co. v. Ba-* *bayan*, 430 F.3d 121, 129 (3d Cir.2005).

*DeWalt v. Ohio Cas. Ins. Co.,* 513 F.Supp.2d 287, 291 (E.D.Pa.2007) ("Bad faith by an insurance company can give rise to two separate causes of action under Pennsylvania law: a breach of contract action for violation of an insurance contract's implied duty of good faith and a statutory action under the terms of Pennsylvania's bad faith law, 42 Pa.C.S. § 8371."); *Schubert v. Am. Indep. Ins. Co.,* 2003 WL 21466915, at *4 (E.D.Pa.2003) ("[T]here is a consensus among both federal and state Courts that § 8371 creates an independent cause of action.").

The Court in *Collins v. Allstate Ins. Co.,* 2010 WL 2510376, *6 (E.D.Pa.), recently decided a similar case to ours, and found that Courts have defined Pennsylvania's bad faith statute, 42 Pa. C.S.A. § 8371, as "any frivolous or unfounded refusal to pay the proceeds of a policy." *Terletsky v. Prudential Prop. & Cas. Ins. Co.,* 437 Pa.Super. 108, 649 A.2d 680, 688 (Pa.Super.Ct.1994) (quoting Black's Law Dictionary 139 (6th ed. 1990)). The *Collins* Court stated:

> To succeed on a claim of bad faith, a plaintiff must present "clear and convincing evidence that 'the insurer did not have a reasonable basis for denying benefits under the policy and that the insurer knew of or recklessly disregarded its lack of reasonable basis in denying the claim.'" *O'Donnell v. Allstate Ins. Co.,* 734 A.2d 901, 906 (Pa.Super.Ct.1999) (quoting *MGA Ins. Co. v. Bakos,* 699 A.2d 751, 754 (Pa.Super.Ct.1997)) (emphasis added). It is a two-pronged test. Where a reasonable basis to deny the claim exists, the insurer will not be held to have acted in bad faith. *Horowitz v. Federal Kemper Life Assurance Co.,* 57 F.3d 300, 307–308 (3d Cir.1995) (Pennsylvania law). An insurer will be held to have acted in bad faith, however, if it fails to " 'accord the interest of its insured the same faithful consideration it

> gives its own interest.' " [citations omitted]

2010 WL 2510376, *6.

Further, the Court in *DeWalt v. Ohio Cas. Ins. Co.,* 513 F.Supp.2d 287, 296–97 (E.D.Pa.2007), stated:

> Under *Cowden [v. Aetna Cas. & Sur. Co.],* an insurer "must accord its insured the same faithful consideration it gives its own interest." *Id.* [389 Pa. 459], 134 A.2d [223] at 228 [ (1957) ] ... *Cowden* is unclear whether negligence on the part of an insurer is enough to create a bad faith claim, or whether a higher showing of recklessness or intentionality is required. There are several suggestions in the opinion that negligence can constitute bad faith ... In addition, in its review of other jurisdictions' decisions on bad faith, the *Cowden* court noted that "almost all the authorities are agreed that an insured may recover from his insurer, regardless of policy limitations, on the ground of negligence, bad faith or fraud in the insurer's conduct in respect of its responsibility." *Id.* at 237. Elsewhere in the opinion, however, the *Cowden* court appears to say that "bad faith" requires something more than mere negligence, stating that "bad faith and bad faith alone was the requisite to render the defendant liable" and that "bad judgment, if alleged, would not have been actionable." *Id.* at 229 (emphasis in original).
>
> Given the distinction *Cowden* makes between actionable "bad faith" and mere "bad judgment," *Cowden* appears to be requiring something more than negligence for a finding of bad faith. Subsequent Pennsylvania Supreme Court decisions, however, have stated in dicta that negligence or unreasonableness in investigating a claim or refusing an offer of settlement can constitute bad faith. See *Gedeon v. State Farm Mut. Auto.*

*Ins. Co.*, 410 Pa. 55, 188 A.2d 320, 322 (1963) (An insurer undertaking the defense of an insured must act "with due care in representing the interests of the insured" and if it "is derelict in this duty, as where it negligently investigates the claim or unreasonably refuses an offer of settlement, it may be liable regardless of the limits of the policy for the entire amount of the judgment secured against the insured."); *Gray [v. Nationwide Mut. Ins. Co.*, 422 Pa. 500], 223 A.2d [8] at 9–10 [ (1966) ] (same). The United States Court of Appeals for the Third Circuit has also described the bad faith standard under *Cowden* as negligence: "Pennsylvania law makes clear that an insurer may be liable [for bad faith] . . . if it unreasonably refuses an offer of settlement." *Haugh*, 322 F.3d at 237 (internal quotations and citations omitted); see also *Schubert*, 2003 WL 21466915 at *4 (denying summary judgment on a bad faith contract claim where the evidence permitted a jury to find that the insurance company had acted unreasonably in declining a settlement offer); *Clark v. Interstate National Corp.*, 486 F.Supp. 145, 146–49 (E.D.Pa.1980) (finding no error in a jury charge permitting the imposition of bad faith liability if the jury found negligence), aff'd without op., 636 F.2d 1207 (3d Cir.1980). Given the *Haugh* decision, the Court concludes that the controlling interpretation of *Cowden* in this circuit is that a contract claim for bad faith requires evidence that an insurer acted negligently or unreasonably in handling the potential settlement of claims against its insured.

■■■ We find that in this case, the evidence shows that Empire has not acted in bad faith under 42 Pa.C.S.A. § 8371. First, contrary to the assertions in Drumheiser's Complaint, Empire promptly addressed Mr. Drumheiser's claim for first party benefits and paid the full amount of medical benefits available under the policy. The fact that Empire paid the full medical benefits to Mr. Drumheiser is supported by Sam Person's Affidavit (Doc. 28, Ex. B) and is not refuted by Drumheiser's *via* his own evidence. Based on the evidence, we find that Empire did not violate Pennsylvania's bad faith statute.

Furthermore, we find that Empire did not act in bad faith by failing to conduct an adequate investigation into whether Mr. Drumheiser constituted a "Temporary worker" under Empire's policy. The main inquiry for bad faith liability is whether there exists a "reasonable basis for denying benefits *under the policy*." *Keefe*, 203 F.3d at 225 (emphasis added). As stated, Mr. Drumheiser as entitled to benefits under Empire's policy only in the event that he is sued for injuring some person or property while working for Mr. Jones. As discussed, Mr. Drumheiser is not entitled to recover on his liability claim under the policy. Though Mr. Drumheiser argues that "Empire has repudiated its obligation to provide the agreed upon benefits under the Policy by abjectly refusing to conduct any investigation" (Doc. 39, p. 13), he again incorrectly construes the insurance policy's liability coverage. Mr. Drumheiser contends that he is entitled to money otherwise available to Mr. Jones under Jones' liability coverage with Empire. As such, Mr. Drumheiser is acting as a third party claimant, not as an insured. However, under Pennsylvania law, a third party claimant cannot have a cause of action for bad faith. *See Allen v. General Accident Ins. Co.*, 2004 WL 323664 (Pa.Com.Pl.2004) ("Under Pennsylvania law, a third party may not maintain a bad faith action against Because Mr. Drumheiser is bringing his bad faith claim as a third party claimant, we will recommend that Empire's Motion for Summary Judgment regarding Mr. Drumheiser's bad faith claim be granted.")

## IV. Recommendation.

Dated: August 19, 2010

Based on the foregoing, it is respectfully recommended that Empire's Motion for Summary Judgment (**Doc. 28**) be granted in its entirety, and that Mr. Drumheiser's Cross Motion for Summary Judgment (**Doc. 38**) be denied. It is also recommended that Judgment be entered in favor of Empire and against Mr. Drumheiser.